## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BRYAN APODACA; on behalf of themselves and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING d/b/a NEWREZ MORTGAGE,<br><br>    Defendant. | Case No.: |

## NOTICE OF REMOVAL

Defendant Newrez LLC dba Shellpoint Mortgage Servicing dba Newrez Mortgage (**Newrez**), pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, gives notice of removal of Oakland County, Michigan Circuit Court Case No. 2022-195857-C2, to this Court.

## I.      STATEMENT OF THE CASE

Plaintiff Bryan Apodaca, on behalf of himself and all others similarly situated, commenced the state court action on September 13, 2022.  A copy of the complaint is attached as **EXHIBIT A**.

Mr. Apodaca asserts state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Michigan Consumer Protection Act, violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and unjust enrichment.  These claims are based on Mr. Apodaca's allegations that NewRez charged him excessive lender placed insurance premiums, which he claims were inflated to cover the cost of "kickbacks" or commissions allegedly paid to NewRez by insurers.

Mr. Apodaca purports to bring this case for himself and for all borrowers, nationwide with mortgage contracts similar to Mr. Apodaca's, whose loans were serviced by NewRez, and "who

were charged and/or paid premiums for a force-placed insurance policy…" dating back "to the start of the longest applicable statute of limitations for any claim asserted from the date this action was commenced . . . ." (Compl. ¶¶ 96, 97.)  Mr. Apodaca seeks injunctive relief, actual damages, statutory damages, restitution, declaratory relief, disgorgement of profits, and attorney's fees and costs.  (*Id.* ¶172.)  While Mr. Apodaca does not specifically allege a damage amount, he claims $4,450.44 was alternatively impermissible or excessive.  (*Id.* ¶¶ 82, 84, 88.)

## II.     BASIS FOR REMOVAL: CAFA

This Court has subject matter jurisdiction under the Class Action Fairness Act (**CAFA**) pursuant to 28 U.S.C. §§ 1332(d), 1453 because (**1**) Mr. Apodaca alleges the putative class contains "thousands" of individuals; (**2**) the citizenship of at least one class member is different than that of NewRez; and (**3**) the aggregate amount Mr. Apodaca places in controversy is likely to exceed $5 million, exclusive of interest and costs.

### 1.     Number of class members

Mr. Apodaca pleads the number of individuals alleged to be in the putative nationwide class "certainly numbers in the thousands."  (Compl. ¶ 99.)

### 2.     Diversity

The parties are completely diverse, which also satisfies CAFA's requirement that at least one member of the potential class of plaintiffs is a citizen of a state different from any defendant. 28 U.S.C. § 1332(d)(2)(A).

Mr. Apodaca says he is "domiciled and a resident of the state of Texas." (Compl. ¶12.)

Newrez is a citizen of Delaware and New York.  Shellpoint Mortgage Servicing is an assumed name of Newrez LLC, a Delaware limited liability company.  The citizenship of a limited liability company is determined by the citizenship of each of its members and submembers. *Akno*

*1010 Mkt. St. St. Louis Mo. LLC v. Nahid Pourtaghi*, 43 F.4th 624, 626 (6th Cir. 2022).  Newrez LLC has one member: Shellpoint Partners LLC.  Shellpoint Partners LLC has two members: NRM Acquisition LLC and NRM Acquisition II LLC.  NRM Acquisition LLC and NRM Acquisition II LLC each have one member: New Residential Mortgage LLC.  New Residential Mortgage LLC has one member: Rithm Capital Corp.

A corporation is a citizen of every state by which it is incorporated and the state where it maintains its principal place of business.  28 U.S.C. § 1332(c); N. Tr. Co. v. Bunge Corp., 899 F.2d 591, 594 (7th Cir. 1990). Rithm Capital Corp., fka New Residential Investment Corp., is a Delaware corporation with its principal place of business in New York.

**3.      The aggregate amount in controversy exceeds $5 million**

Under CAFA, the claims of all putative class members in a class action are aggregated to determine if the amount in controversy exceeds $5 million.  *See* 28 U.S.C. § 1332(d)(6).

The complaint defines a proposed nationwide class that "certainly numbers in the thousands" consisting of borrowers subject to form mortgage contracts like Mr. Apodaca's whose mortgage loans were serviced by NewRez.  (Compl. ¶¶ 96, 99.)  The class period is alleged to date back to "the longest applicable statue of limitations for any claim asserted…" which is six-years for Mr. Apodaca's breach of contract claim. Mr. Apodaca seeks actual damages, statutory damages, restitution, declaratory relief, disgorgement of profits, attorney's fees, and costs (*Id.* ¶172.)  While he does not specifically state the amount of his damages or the damages claimed on behalf of the class, he claims that the $4,450.44 premium he was charged for lender placed insurance was either completely unauthorized (Compl. ¶ 89) or "grossly" excessive to the extent it exceeded the cost of his prior, borrower purchased policy with Progressive, which cost $981.00 (Compl. ¶ 150). Extrapolating Mr. Apodaca's claims to "thousands" of unnamed class members, the aggregate

amount in controversy exceeds $5 million.[1]

### III. ALL PROCEDURAL REQUIREMENTS HAVE BEEN SATISFIED

1.      Newrez was served with the complaint and summons on September 13, 2022. This notice of removal is timely as it has been filed within 30 days of Newrez's receipt of the complaint and summons. 28 U.S.C. § 1446(b).

2.      This Court is the appropriate forum for removal.  Mr. Apodaca filed suit in Detroit, Michigan.  The United States District Court for the Eastern District of Michigan is the federal district court embracing Detroit.

3.      Copies of all process, pleadings, and orders filed in the state court action are attached as EXHIBITS 1 (complaint) and 2 (summons).

4.      Newrez will promptly file a copy of this notice of removal with the clerk of the Circuit Court for Oakland County, where this action is pending, and will serve such notice on plaintiffs under 28 U.S.C. § 1446(d).

5.      By this notice, Newrez does not waive any objections to service, jurisdiction, venue, or any other defenses or objections it may have.  Newrez reserves all defenses, motions, and pleas.  Newrez prays the state court action be removed to this court, all further proceedings in the state court be stayed, and for all additional relief to which Newrez is entitled.

Respectfully submitted, this the 13 day of October, 2022.

---

[1] Newrez maintains that the $5 million CAFA jurisdictional threshold is evident from the face of the complaint. To the extent the Court believes additional evidence is necessary on that issue, Newrez would request the opportunity to submit additional evidence to satisfy the Court that the aggregate amount in controversy is $5 million.

*/s/ Brian C. Summerfield*

**SCHENK & BRUETSCH PLC**
Brian C. Summerfield (P57514)
211 West Fort Street, Suite 140
Detroit, Michigan 48226
(313) 774-1000
Brian.Summerfield@SBDetroit.com
Attorneys for Defendant

*Attorney for Defendant Newrez LLC*

6

# EXHIBIT 1

This case has been designated as an e-filing case, for more information please visit www.oakgov.com/efiling.

**STATE OF MICHIGAN**

2022-195857-CZ

**OAKLAND COUNTY CIRCUIT COURT**   JUDGE YASMINE I. POLES

| | |
|---|---|
| BRYAN APODACA, an individual, on behalf of the general public, | CASE NO.: 2022-        -CZ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | 1. Breach of contract; |
| | 2. Breach of the implied covenant of good faith and fair dealing; |
| NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING d/b/a NEWREZ MORTGAGE, | 3. Violation of the Michigan Consumer Protection Act; |
| | 4. Violation of the Pennsylvania Consumer Protection Act; |
| Defendant. | 5. Money Had and Received/ Unjust Enrichment (Restitution). |
| | **(DEMAND FOR JURY TRIAL)** |

ZIMMERMAN REED LLP
Caleb Marker (MI. Bar # P70963)
Flinn T. Milligan
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
(877) 500-8780 Telephone
(877) 500-8781 Facsimile
Email: caleb.marker@zimmreed.com

ZIMMERMAN REED LLP
Hart L. Robinovitch (Ariz. Bar #020910)
14646 N Kierland Blvd., Suite 145
Scottsdale, AZ 85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile
Email: hart.robinovitch@zimmreed.com

*Counsel for Plaintiff*

There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in the complaint.

## CLASS ACTION COMPLAINT

Plaintiff Bryan Apodaca ("Plaintiff"), individually and on behalf of all others similarly situated, by and through the undersigned counsel of record, hereby brings this Complaint against Defendant Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Newrez" or "Defendant") and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and on information and belief as to all other matters, as follows:

### I.     INTRODUCTION

1.     This is a class action filed to redress injuries that Plaintiff and a class of consumers have suffered and will continue to suffer as a result of the practices of Defendant relating to force-placed insurance policies. Plaintiff and the Class allege that Defendant derives improper financial benefits from imposing force-placed hazard insurance policies on properties, injuring Plaintiff and the class. In addition, Defendant is charging residential borrowers for the "cost" of procuring force-placed insurance, but a portion of such "cost" is returned, transferred, kicked-back or otherwise paid to Newrez and/or its related entities. Newrez and/or its related entities do no meaningful work for the sums received, and therefore the payments forwarded to them amount to an unearned kickback designed to encourage the referral of business to third-party insurers at extraordinarily high prices, to the detriment of Plaintiff and the Class. While Newrez has discretion in selecting a third-party insurance company to place insurance with, if and when authorized by contract, it abuses that discretion and self-deals to the detriment of Plaintiff and the Class by selecting the insurance company that provides Newrez the greatest benefits, opposed to the most favorable

terms and lowest prices for the benefit of Plaintiff and the Class. Such practices are generally referred to as reverse competition and violate the implied covenant of good faith and fair dealing which is part of every contract, as well as other law. Plaintiff seeks to recover damages equal to the amount of the improper and inequitable financial benefit received by Defendant and/or its affiliates as a result of this anti-consumer practice, and to prevent the future collection of amounts charged against the mortgage accounts of residential borrowers but not yet collected.

2.      Mortgage lenders require borrowers to purchase and maintain hazard insurance coverage on the secured property as a condition of funding home loans. *See* Deed of Trust, ¶ 5 (attached as Exhibit A). Plaintiff was required to obtain and maintain hazard insurance as a term of his mortgage.

3.      In the event that borrowers, including Plaintiff, are unable to maintain their hazard insurance policies, Defendant has the ability and discretion to purchase alternative insurance to protect its interest. *See* Deed of Trust, ¶ 5 (attached as Exhibit A). In doing so, however, it is not permitted to self-deal and try to extract additional financial benefits for its benefit to the detriment of Plaintiff and the Class. The discretion allowed must be exercised in good faith and in an attempt to treat borrowers fairly, in good faith and not to self-deal. Defendant, however, fails to do this and in the event of a lapse replaces borrowers' policies with considerably more expensive policies provided by National Fire & Marine Ins. Co. ("National Fire") and/or other third-party insurers (collectively "Insurers") pursuant to a contract between Defendant and the third-party insurer, forcing borrowers to pay for the policies by diverting their monthly mortgage payments and/or debiting the borrowers' escrow accounts. These policies are known as "force-placed" or "lender-

placed" insurance policies. *See* 24 C.F.R. §1024.37(a).[1] Such policies provide less coverage and are substantially more costly (two to ten times the price) than the borrowers' original policies, and provide improper, undisclosed, and lucrative financial benefits and kickbacks to lenders/servicers and/or their affiliates, as well as to providers of force-placed insurance.

4.      Here, Defendant has engaged in a pattern of unlawful and unconscionable profiteering and self-dealing in regard to its purchase and placement of force-placed insurance policies in bad faith. This violates the implied covenant of good faith and fair dealing which is part of every contract.

5.      In this action, Plaintiff challenges Newrez's practice of purchasing force-placed hazard insurance from third-party insurers, such as National Fire pursuant to agreements to obtain a commission or kickback, resulting in unauthorized, unjustified, and unfairly inflated costs to the borrower for force-placed insurance in violation of law. In doing so, Newrez acted with bad motive and bad intentions in order to penalize Plaintiff and the Class.

6.      As set forth in detail below, Defendant has engaged in unlawful, abusive, and unfair practices with respect to force-placed insurance by receiving kickbacks in the form of purported fees, payments, commissions, "rebates" and/or other things of value from providers of force-placed insurance.

---

[1]   All state laws are preserved and are not preempted by any federal law. *See* 12 U.S.C. §§ 2615, 2616 ("This chapter does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency. The Bureau is authorized to determine whether such inconsistencies exist. The Bureau may not determine that any State law is inconsistent with any provision of this chapter if the Bureau determines that such law gives greater protection to the consumer. In making these determinations the Bureau shall consult with the appropriate Federal agencies").

7. Upon information and belief, Newrez entered into agreements with Insurers, pursuant to which Newrez and/or its subsidiaries or affiliates typically receive a portion of the premiums for each force-placed insurance policy purchased for a borrower. Moreover, upon information and belief, those arrangements are exclusive. Further the agreements and their terms with regard to the specific amount or percentage of the rebates are not disclosed to borrowers, like Plaintiff.

8. Upon information and belief, Defendant has received substantial kickbacks and rebates from FPI policies imposed on class members during the class period. Upon information and belief a substantial portion and majority percentage of each premium charged to borrowers like Plaintiff for FPI polices are secretly rebated to Defendant.

9. In bringing this class action, Plaintiff does not challenge the rates filed by National Fire and/or any other insurance carrier. Plaintiff does not challenge the rates of their force-placed hazard insurance provider as excessive. Rather, Plaintiff challenges the manner in which Defendant selected Insurers and its force-placed insurance products over alternatives for self-gain; the manipulation of the force-placed insurance process by Defendant; and the impermissible and unconscionable kickbacks that were included in the premiums that were added to the balance of Plaintiff's and Class members' mortgage loans. Plaintiff does not complain that he was charged an excessive insurance rate; rather, he complains that Newrez acted unlawfully and in bad faith and motive when it selected the particular insurance company and its particular rates and coverage, when other, more suitable, lower priced options were available. Even assuming it was proper to force-place Plaintiff with insurance (it was not), had Defendant used its discretion fairly and in good faith to select a lower-priced insurance option, Plaintiff would have been charged less money.

5

Further, Defendant could have funded the premium on Plaintiff's then-existing policy at the same rate, saving Plaintiff money and Defendant administrative effort.

10.     Thus, while Plaintiff does not challenge Newrez's ability to force-place insurance policies and to charge fees/premiums for the same when appropriate (here it was not), Plaintiff does challenge the manner in which Defendant manipulated the force-placed insurance process for its own financial gain, with bad motive, and to self-deal, in breach of Newrez's contractual duties and in violation of statutory and common law.

11.     At issue in this case is whether Defendant has been unjustly enriched by manipulating the force-placed insurance process so as to self-deal and obtain unearned kickbacks, and breached the express and/or implied terms of the mortgage contract (including the implied covenant of good faith and fair dealing) by unreasonably, unconscionably and unlawfully exercising their contractual discretion to manipulate the force-placed insurance process so as to obtain financial benefits for themselves at Plaintiff and the Class's expense and, in turn, misrepresenting the true cost of insurance charged to Class members and overcharging them beyond charges permitted by the contract. In this action, Plaintiff challenges Defendant's unlawful conduct and seeks for himself and the Class compensatory damages, restitution for Defendant's unjust enrichment, declaratory, injunctive and other equitable relief.

## II.     THE PARTIES

12.     Plaintiff Bryan Apodaca ("Plaintiff"), is an individual domiciled and a resident of the state of Texas.

13.     Defendant Newrez is a Delaware limited liability company and wholly owned subsidiary of New Residential Investment Corp., a Delaware corporation headquartered in Plymouth Meeting, PA.

### III.    JURISDICTION & VENUE

21.    This Court has personal jurisdiction over this matter because Defendant is licensed

to do business in Michigan or otherwise conducts business in the State of Michigan, a substantial

portion of the wrongdoing alleged by Plaintiff occurred in the State of Michigan and this County,

and Defendant has sufficient minimum contacts with and/or otherwise has purposely availed itself

of the markets of the State of Michigan and this County such that it is fair and just for Defendant

to adjudicate this dispute in this County. For instance, when Plaintiff was sent a notice of transfer

from his original lender/mortgage servicer to Defendant, he was informed that Defendant's address

was in Troy, Michigan and instructed to communicate with Defendant in Troy, Michigan. Upon

information and belief, the deceptive and unlawful business practices of Defendant that are

challenged in this action took place at Defendant's offices in Troy, Michigan, in significant part,

and those practices emanated to other states (including Texas), injuring class members there in a

common way.

22.    Venue is proper in this County because a substantial part of the events, transactions,

and/or omissions giving rise to the claims asserted herein occurred in this County, and a substantial

portion of Defendant's alleged wrongdoing is believed to have occurred in this County.

### IV.    FACTUAL ALLEGATIONS

**A.    Overview of Force-Placed Insurance**

14.    When a home loan is approved, the mortgage servicer typically requires the

borrower, under the terms of the mortgage, to carry the proper amount of hazard or flood insurance

on the property to insure it against any perils. While force-placed insurance has been part of the

mortgage process for decades, the full extent of the undisclosed kickbacks, unearned commissions,

and profit structures have only more recently been uncovered.

7

15.     Each and every mortgage at issue in this litigation that is owned and/or serviced by Newrez requires borrowers to purchase and agree to maintain hazard insurance coverage on their secured property as a condition of closing.

16.     Class members' mortgage contracts are standard-form contracts ("uniform instruments") of adhesion that contain the same or materially the same clauses (usually in paragraph 5) addressing the lender's ability to force-place insurance, exercising its own discretion.

17.     Paragraph five of Plaintiff's Mortgage (Deed of Trust/"Uniform Instrument Form 3044 1/01 (rev. 10/17)") provides in part: "If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense."

18.     In order to ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain insurance; the amounts disbursed for the procurement of such insurance becomes additional debt secured by the mortgage. Paragraph five of Plaintiff's mortgage agreement contains such a provision affording Newrez the authority to force-place their insurance in the event of a lapse. Thus, the failure of a borrower to maintain hazard insurance is clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the contract.

19.     This discretion afforded to Defendant to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself. Defendant routinely exceeds the bounds of reasonableness and the spirit, intent, and letter of the mortgage contract itself by force-placing in a manner and in amounts that are not required to protect the lender's interest in the property, in an attempt to self-deal and reap profits from the borrower which

are not required nor contemplated by the mortgage contract, and through other conduct described herein with respect to the force-placement of insurance.

20.     The mortgage contract (or any other document) does not disclose that the lender or servicers, or their affiliates, will receive a kickback, "commission" or other compensation from the force-placed insurance providers for purchasing the insurance, or that the commission will be based on a percentage of the cost of the premium of the force-placed insurance, thereby incentivizing Defendant to select high-cost policies, despite the detriment to Plaintiff and the Class. Furthermore, the mortgage contract does not disclose that the cost of the force-placed insurance policy will incorporate certain costs not properly chargeable to the borrower. The contract also does not disclose that the price of the forced-priced policy chosen will be several multiples of the prior policy to fund the kickbacks. The contract does not disclose the percentage or amount that is rebated to Defendant from the insurer (even if it is the majority of the premium) on each force-placed policy.

21.     Any kickbacks received by Newrez are unearned and unreasonably charged to Class members as part of the force-placed insurance premiums. No services are performed for these kickbacks. Rather, any nominal services performed in relation to the placement of the force-placed policies are done by the Insurers, not Newrez. Any Insurers, including National Fire, are more than compensated for any services they perform through the portion of the force-placed insurance premiums they retain. The payments rebated to Newrez are undisclosed and unauthorized kickbacks.

22.     Additionally, once a lapse in hazard insurance occurs, Plaintiff and the Class have no way of refusing the charges for the force-placed insurance premiums. Likewise, once a lapse occurs, and the lender or third-party servicer decides to force place insurance, Plaintiff and the

9

Class have no way of retroactively placing the policy with a lower cost or higher quality provider; the decision is 100% that of the lender and Plaintiff and the Class are completely at the mercy of the lender to exercise its discretion in good faith when force placing the policy and selecting the insurance provider and applicable rate.

37.     These force-placed insurance policies are almost always more expensive than standard insurance coverage. Such policies can cost as much as ten times more than comparable, or better, more comprehensive, insurance policies that are easily available in the marketplace. While the force-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower. Defendant selected National Fire (or other third-party Insurers) policies because of the financial incentives they negotiated to receive and, in turn, self-dealt, acted in bad faith, and breached the implied covenant of good faith and fair dealing.

**B.     Defendant's Force-Placed Insurance Program**

38.     Newrez owns and/or services real property mortgages. Newrez is one of the many large mortgage owners or servicers in the country that have reaped an improper and substantial windfall from the force-placement of insurance on borrowers' property through the manipulation of the force-placed insurance market.

39.     Upon information and belief, Newrez force-place insurance policies through Insurers, such as National Fire, and outsources insurance tracking, monitoring and processing to those Insurers. Upon information and belief, the tracking and placement services on Class members' transactions are conducted by Insurers and/or their affiliates.

40.     To accomplish the force-placement of insurance and the associated premiums, Newrez, in bad faith and motive, entered into exclusive arrangements with Insurers such as

National Fire whereby Newrez secures coverage on the borrower's property and then charges the consumer for the premiums it allegedly paid to the insurer's affiliates.

41.    The premiums charged for force-placed insurance are not arrived at on a competitive basis and are significantly higher than those available to Defendant in the open market for comparable or more comprehensive policies. Insurance companies compete for referrals from mortgage companies like Defendant by offering lucrative rebates and kickbacks. This is generally referred to as reverse competition. Servicers, like Newrez, have no incentive to comparison shop for lower cost insurance with comparable or better coverage. Rather, Newrez is financially motivated to procure policies from the provider that will provide the best financial benefit to the servicer (*i.e.*, Newrez) in terms of kickbacks, unearned commissions and/or other compensation (often in the form of low cost administrative services).

42.    Upon information and belief, Insurers such as National Fire offered Newrez financial incentives (either in cash, anticipated receipt of future rebates/kickbacks and/or through the provision of other things of value) as an incentive to enter into the exclusive contractual relationship with it. Partially as a result of these perverse incentives, there being no incentive or attempt to shop for a competitively priced policy, the commissions on force-placed policies are significantly higher than those available on lower priced insurance policies of comparable or better coverage. Accordingly, no good faith, arm's-length transactions are taking place. Rather, such attempts are completely bypassed in favor of Defendant's decision to exploit the situation and self-deal without concern for the resulting consequences (and inflated and unnecessary costs) placed on the borrower/Class member. Simply put, Defendant exercises its discretion to intentionally secure the highest priced, lowest coverage policies that allow them to maximize their fees and revenue, while Class members bear the entire financial burden to their detriment. This type of

11

situation is generally referred to as reverse competition. *See generally* Testimony of Birny Birnbaum Executive Director Center for Economic Justice Before the Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services U.S. House of Representatives "Insurance Oversight: Policy Implications for U.S. Consumers, Businesses and Jobs" July 28, 2011, available at https://financialservices.house.gov/uploadedfiles/072811birnbaum.pdf. ("The incentives and potential for abuse in the administration of LPI are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage."); Statement of Birny Birnbaum on behalf of The Center for Economic Justice, The Consumer Federation of America, United Policyholders, The Center for Insurance Research, The National Fair Housing Alliance and The National Consumer Law Center (on behalf of its low-income clients) Before the Senate Committee on Banking, Housing and Urban Affairs Subcommittee on Economic Policy "Implementation of the Biggert-Waters Flood Insurance Act of 2012: One Year After Enactment." September 18, 2013, available at https://uphelp.org/wp-content/uploads/2021/01/Forced-place-flood-insurance-testimony-senate-hrg-130918.pdf ("Reverse Competition in FPI Markets Leads to Excessive Charges to Borrowers Reverse competition describes a market structure in which consumers/borrowers exert little or no market power over prices. Instead of competing for individual consumers, insurers compete for the entities with the market power to steer the ultimate consumer to the insurer. Insurers compete for the servicer's business by providing considerations to the servicer, with the cost of such

considerations passed on to the borrower. Greater competition for the lender's business leads to higher prices of credit-related insurance, including FPI, to the borrower. This form of competition, which results in higher prices to consumers, is called reverse competition."); Birny Birnbaum, *Overview of Lender-Placed Home Insurance*, NAIC Public Hearing on Lender-Placed Insurance, Aug. 9, 2021, available at https://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insuranc e_presentation_birnbaum.pdf

43.    As a result, the amounts charged by Newrez for force-placed insurance policies are many times more than what borrowers paid for voluntary coverage and many times more than what Newrez would pay if it had obtained insurance coverage on a competitive basis on the open market and without the exclusive arrangements described above. Moreover, force-placed insurance policies provide less coverage than voluntary insurance policies, as they protect only the lender's interest in the property and typically do not cover the borrower's equity, liability, or personal property.

44.    Defendant's force-placed insurance scheme operates in the same or materially the same manner for all Class members.

45.    When a borrower's policy lapses, Newrez will charge the cost of the force-placed insurance premium to the borrower. Upon information and belief, Newrez then receives a significant portion of the payments as a kickback or rebate, disguised as commissions. Newrez performs little or no work to justify these payments. Instead, it is compensated for the referral of the business to a high-priced insurance provider. These kickbacks induce Newrez into continuing its exclusive relationship with Insurers and force-placing a more expensive policy than might otherwise have been obtained.

13

46.     This arrangement provides Newrez with an incentive to purchase the highest-priced force-placed insurance policy possible—the higher the cost of the insurance policy, the higher the commission or kickback. Ultimately, the borrower pays.

47.     The commissions or kickbacks are paid by Insurers or their affiliated insurance companies to Newrez in order to manipulate the force-placed insurance market and continue their pre-existing, uncompetitive, and exclusive relationship with Newrez.

48.     Essentially, Insurers are engaging in a form of commercial bribery in order to induce Newrez to purchase ultra-high-priced, low-coverage, force-placed insurance policies, and have Newrez refrain from seeking competitive bids in the market or to take other reasonable measures to procure policies that provide comparable coverage at lower prices.

49.     Upon information and belief, the kickbacks paid by Insurers to Newrez are tied to the cost of the force-placed insurance and are usually a significant percentage of the total cost of each premium.

50.     Upon information belief, Newrez's arrangement with Insurers such as National Fire is covered by a pre-arranged master policy and Newrez assigns any insurance coverage monitoring functions to the Insurer that force-places the insurance. Newrez, therefore, plays no role in purchasing insurance for an individual homeowner and provides no services for the rebate received. Therefore, Newrez has done nothing but enter into an exclusive and all-inclusive agreement with the Insurers. Upon information and belief, any actual work performed by Newrez, which is claimed to entitle them to a commission for the placement of a policy is false and non-existent. In turn, the premiums or cost of insurance coverage represented and charged to Class members is deceptive, misleading, false, and inflated by the amount retained or received by Newrez.

51.    Upon information and belief, the Insurers agreement with Newrez provides that all properties within Newrez's portfolio will be monitored by the Insurer  and if a homeowner's policy voluntarily lapses or is deemed insufficient, such property will be automatically force-placed with an insurance policy provided by the Insurer. The insurance is automatically placed on the property and the premium is ultimately charged to the homeowner even if the lapse is discovered many months or years later.

52.    The force-placed insurance policies issued by Insurers generate improper and unjust windfalls to the Insurers and Newrez and their affiliates at the expense of the borrowers in the Class with whom the Insurers has no contractual relationship. The sole justification for the tactics described herein is the unjust enrichment of the Defendant and the Insurers and/or their affiliates with whom Plaintiff and the Class have no contractual relationship.

53.    Upon information and belief, when a lapse in a homeowner's insurance is discovered, an automated process is applied to all borrowers like Plaintiff and the Class. For example, the Insurer's software begins a cycle, at regular intervals, of identical form letters, form insurance policies and "binders" purporting to come from Newrez that are sent to borrowers regarding the lapse in insurance and the force-placement of insurance through the Insurer  or its affiliates.

54.    Therefore, Newrez is paying the Insurer not only for force-placed insurance premiums, but also for a bundle of services including performing Newrez's duty of administering and services the mortgages (i.e., monitoring and tracking Newrez's portfolio for insurance lapses and providing notification and customer service to homeowners under the mortgage). This bundle of administrative services includes Newrez's cost of monitoring and servicing its portfolio of loans and is not properly chargeable to Plaintiff or the Class under their mortgages.

15

55.     Under this common course of conduct in force-placing insurance, the "premiums" for insurance that are charged to the Plaintiff and the Class are exorbitant, unfair and unlawful because they include not only the high (and non-competitive) cost of the insurance, but also the illegal kickbacks to Newrez, which performs little to no function or services related to the force-placement of the individual policies. Further, the cost of the bundle of administrative services that the Insurers are providing to Newrez is subsumed within the high premium cost.

56.     Therefore, in addition to performing no work in the actual placement of the force-placed policy, Newrez's actions, in concert with the Insurer, act to penalize borrowers, including Plaintiff and the Class, by sticking them with the highest priced force-placed insurance policy possible. Newrez abuses its discretion to force-place insurance arbitrarily, in bad faith and with bad motive and intent in order to secure a substantial kickback from Insurers and self-deal. Lower priced options for comparable insurance coverage (such as paying the premium due on any policy belived to have lasped) are intentionally bypassed by Newrez in favor of the purchase of the force-placed policy that generates a rebate.

57.     Generally, the high-cost premiums are added to the principal balance of the borrower's mortgage loan, deducted from his or her tax and insurance escrow account or otherwise charged to the borrower..

58.     The actions and practices described herein are undertaken in bad faith and motive. The practices are unfair and deceptive to borrowers like Plaintiff. Defendant misrepresents to individual Newrez borrowers that they will procure a policy to cover the risk arising from their properties when, in fact, a "master" policy has already been put in place. Defendant then charges borrowers inflated premiums for the master policy, which are calculated to include kickbacks and costs not properly charged to the borrower without regard for competition on the open market.

16

Defendant's only goal is to maximize their profits by charging high prices and collecting unjustified kickbacks.

59. Defendant's manipulation of the force-placed insurance process has maximized the profits to themselves to the great financial detriment of Plaintiff and the Class, who are never treated fairly or even consulted during the process. Defendant was not, and is not, authorized by and federal, state, or local governing body, contract, or agreement to manipulate their force-placed insurance purchases in bad faith, as alleged above.

60. Force-placed insurance policies are extremely lucrative for Defendant. Upon information and belief, voluntary policies sold by Defendant typically cost much less than force-placed policies, paying a much lower commission, due to the presence of competition in the voluntary policy market.

61. Upon information and belief, the bulk of the commissions earned by Defendant are from force-placed policies such as Plaintiff's.

62. The New York Times has reported on the abusive practices with force-placed insurance:

> "Force-placed insurance appears to be the dirty little secret of the mortgage industry," Mr. Lawsky [the superintendent of the New York State Department of Financial Services] said in an interview last week. "It is a silent killer harming both consumer and investors while enriching banks and their affiliates."
> ***
> Force-placed insurance has exploded during the foreclosure crisis. Once a backwater that generated $1 billion a year, it is now a $6 billion-a-year business. Much of its growth has come on the backs of homeowners.
> ***
> There is a lot to love about force-placed insurance—if you sell it. The policies typically cost at least three times as much as ordinary property insurance. Some borrowers have been charged much more—up to 10 times the prevailing rate—according to people knowledgeable about these practices who spoke on condition of anonymity to maintain business relationships.
> ***

All in all, force-placed insurance represents a major profit center for mortgage servicers and the companies that write the policies. In many cases, you will not be surprised to learn, the servicers and the insurers are affiliated. This sets up the potential for conflicts of interest among loan servicers that are often supposed to represent investors owning mortgage loans bundled into securities.

\*\*\*

Many banks have set up affiliates that provide this insurance or take on some of the risks that other companies have insured, known as reinsurance. These cozy relationships are a focus of investigators.

\*\*\*

Insurers that are not affiliated with lenders have paid fees from 15 to 20 percent of the policy to the banks that place the insurance, according to former industry executives. This indicates how lucrative the business is.[2]

63. Upon information and belief, National Fire (and/or other Insurers) pays kickbacks in the form of inflated commissions and/or similar unlawful sums to Newrez in connection with force-placed insurance. The kickbacks paid by National Fire (and/or other Insurers) to lenders and/or their affiliates on force-placed insurance coverage are the subject of numerous reported cases and government investigations.

64. On May 21, 2012, the New York Department of Financial Services held a Public Hearing on force-place insurance. At that hearing, expert economist and former insurance regulator Birny Birnbaum testified regarding force-placed practices. Birnbaum's report concluded, *inter alia*, (1) "The Lender-Placed Home Insurance (LPI) market is characterized by reverse competition, in which the cost of insurance placed on the borrower's loan is pushed up by LPI insurers in competition for servicers' business"; (2) "The LPI market is not beneficially competitive to consumers, as evidenced by numerous measures, including market concentration, high prices, low loss ratios, insurer profitability and kickbacks to servicers'" (3) "Insurer excuses for maintaining excessive rates are unsupported by any evidence, actuarial principles or logic and

---

[2] Gretchen Morgenson, *Hazard Insurance With Its Own Perils*, The New York Times, January 22, 2012, p. BU1, available at <https://www.nytimes.com/2012/01/22/business/hazard-insurance-with-its-own-perils-fair-game.html> (last accessed June 14, 2022).

are without merit." Birny Birnbaum, *Testimony of Birny Birnbaum on behalf of the Center for Economic Justice*, May 21, 2012. Birnbaum's statements accurately describe Defendant's nationwide practices with regard to force-placed insurance, in material respects.

65.     Plaintiff does not dispute that Newrez is entitled under Plaintiff's and each Class member's mortgage to purchase force-placed insurance when a lapse in coverage actually occurs; however, Plaintiff does maintain that said purchase must be selected and made in good faith, without bad motive and in compliance with the mortgages' terms.

66.     Plaintiff challenges the uncompetitive and unfair method used to select and place the policies which is a result of illegal kickbacks and unearned commissions.

67.     Defendant's manipulation of the force-placed insurance process has maximized the profits to itself to the great detriment of the Plaintiff and the Class. Defendant was not, and is not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate its force-placed insurance purchases in bad faith, and engage in unconscionable practices. Defendant's exclusive arrangement is in place solely to maximize its profits through the manipulation of the force-placed market by collecting unjustified kickbacks or other compensation. This conduct is prohibited by law.

**C.     Plaintiff is a Typical Victim of Defendant's Common Course of Misconduct**

68.     In 2021, Plaintiff refinanced a mortgage on a single-family home located at 18511 Panton Terrace Lane, Cypress, Texas 77429 (the "Property"). The property was for Plaintiff's personal use and enjoyment.

69.     Plaintiff executed a written thirty-year mortgage with Intercontinental Capital Group, Inc., a direct lender, on February 22, 2021 in the amount of $322,911.00 (the "Mortgage Agreement").

70. Typical of most mortgages, Plaintiff's mortgage included a provision that required him to secure and pay for adequate property insurance that protected the Property against loss by fire and other hazards. *See* Deed of Trust, ¶ 5 (copy attached as Exh. A). It also provides that the lender has the right to force-place insurance in the event Plaintiff fails to secure such a voluntary policy or if Plaintiff's voluntary policy lapses.

71. Plaintiff honored all obligations under the terms of the mortgage/deed of trust at the time the loan was obtained and thereafter. Plaintiff obtained insurance and never failed to pay for insurance premiums due (fully funding the escrow account), in the manner instructed and as required to close the loan, yet a few months later was improperly force-placed with insurance by Defendant.

72. The closing documents on the loan Plaintiff obtained on February 22, 2021 show that Plaintiff secured a hazard/property policy through Progressive Insurance (Policy No. TXW041242) carrying a policy premium of $981 identifying Intercontinental Capital Group Inc. (Intercontinental"), as the Mortgagee for Loan #2101347154. This is confirmed by the Progressive Homeowner's Declaration Page in the closing file, copies of which were provided to both Plaintiff and Intercontinental. The Hazard Insurance Endorsement Letter for Loan #2101347154 and Progressive Policy TXW041242 indicated that the Mortgagee Clause was to read "Intercontinental Capital Group, Inc, Its Successors and/or Assigns" and endorsements were be sent directly to Intercontinental at "265 Broadhollow Rd., Suite 220, Melville, NY 11747." The insurance policy arranged was to auto-renew after the policy period and because of that Plaintiff and Intercontinental arranged for Plaintiff to pay sufficient funds on a monthly basis to the escrow account throughout the loan term in order to fund any future insurance premiums and to ensure requisite insurance coverage existed at all times without any lapse. The Homeowner's Declaration

Page from Progressive noted that the funds needed for the insurance premiums were paid via the amounts collected and deposited into the escrow account at Intercontinental Capital Group ("Escrow: Yes.") The Homeowner's Declaration Page also identified the agent (North American Advantage Insurance Services, LLC PO Box 23039, St. Petersburg, FL) with its toll free number to contact for any needed policy service. The "Closing Disclosure" prepared by Intercontinental, showed $981 being collected from Plaintiff for the insurance prior to closing, and further stated on page 4: "Escrow Account: X Will have an escrow account (also called an "impound" or "trust" account) to pay the property costs listed below. Without an escrow account, you would pay them directly, possibly in one or two large payments a year. Your lender may be liable for penalties and interest for failing to make a payment." The lender closing instructions to Escrow/Title/Closing Agent confirmed that the loan could not close without satisfactory evidence of hazard/fire insurance: "Do not disburse without evidence of Hazard Insurance…..Hazard insurance must be equal to the lesser amount of the loan or full replacement value of the property improvements and must extend for either a terms of at least 12 months after the closing date for purchase transactions or six (6) months after the closing date for refinances." Further, the loan had a Planned Unit Development Rider indicating that insurance under ¶ 3 and ¶ 5 of the Deed of Trust, and associated escrow payments, were not necessary so long as the Owner's Association maintained a master/blanket policy. By funding the loan, Intercontinental confirmed that Plaintiff satisfied all obligations he had with respect to maintaining and paying for any required hazard/properly insurance.

73.     Once the loan was transferred from Intercontinental to Defendant, Defendant assumed all lender obligations under the note and deed of trust/mortgage contracts and it was Defendant's obligation and duty to timely pay the insurance premium from the escrow funds that

it collected and possessed. Defendant wrongfully failed to do so and failed to take reasonable steps to confirm existing insurance before force-placing a new policy at more than four times the price, resulting in Plaintiff being charged an excessive amount for insurance. Had Defendant paid the policy premium due to Progressive from the escrow funds collected and held in trust, as agreed and arranged, Plaintiff would have paid less for insurance, not been force-placed with the more expensive National Fire policy and not incurred financial injury.  Defendant's conduct breached its duties to Plaintiff.

74.     At the time of the Mortgage Agreement, Progressive was designated as the insurance carrier for the home insurance, with a monthly premium of $81.75 for a total of $981 annually.

75.     Plaintiff did not fail to pay for insurance coverage. Intercontinental Capital Group confirmed that the insurance premium was due on May 23, 2021 and sufficient funds for annual coverage were collected in advance from Plaintiff and placed in trust in the escrow account at that time for the purpose of having Intercontinental and/or its successors and assigns (Newrez) make that premium payment in a timely manner. The closing statement on Plaintiff's loan in section G shows the following was collected at the time of the closing in February 2021: "01. Homeowners Insurance $81.75 per month for 12 mo. $981.00."  Prior to the closing, Plaintiff provided Intercontinental all other information it needed to do this.

76.     Effective on or about March 26, 2021, Intercontinental Capital Group, Inc. assigned, sold, or transferred all interest in Plaintiff's mortgage, including the loan servicing, to Newrez.

77.     On March 26, 2021 Plaintiff was informed by Intercontinental Capital Group that his mortgage loan had been sold to Newrez, LLC and now bore "Newrez LLC loan number

203408174." The Transfer of Mortgage informed Plaintiff: "The mortgage clause should now read as the following: Shellpoint Mortgage Servicing, ATIMA PO Box 7050, Troy, MI 48007. Please direct all further correspondence to the above referenced mortgages as they will be handling the servicing of the loan." The "Transfer of Mortgage" letter confirmed that that the escrow would continue to be managed by Defendant going forward, stating "Will this Loan be Escrowed? Yes."

78.     Thereafter Plaintiff received a status report from Defendant Newrez, indicating it Defendant had received the closing statement. The closing statement showed proof of insurance and collection of at least 12 months of insurance premiums.

79.     On or around April 2022, Plaintiff checked the Newrez mobile application and saw that his mortgage payments had increased significantly and further learned that this was due to the high price of the force-placed insurance policy. Plaintiff immediately called Newrez to report this problem and register a dispute.

80.     During Plaintiff's call with Newrez in or around April 2022, Defendant stated it sent him a letter on July 19, 2021. Defendant immediately sent him an additional copy of this letter dated, July 19, 2021. Defendant claimed to have sent Plaintiff this letter on or around July 19, 2021, however Plaintiff does not recall ever receiving the letter at that time. Plaintiff immediately searched his received mail and the inbox of his e-mail and was unable to find any record the letter was sent to him as Defendant claimed.

81.     The letter dated July 19, 2021 from Defendant Newrez states that "We have not received proof of hazard coverage on the above referenced property as required under the terms of your mortgage and as requested in our previous notices. Because of this, it has become necessary to place lender-placed insurance coverage on your property. This policy provides limited coverage and is not comparable to a standard hazard policy. The policy does not provide coverage for

23

personal property or owner's liability to protect your interest. We strongly recommend that you obtain an insurance policy of your choice as soon as possible. The premium will be charged to your escrow account. If you do not have an escrow account, one will be set up for you. Your monthly payments will be adjusted to cover this cost. This policy may be cancelled at any time by giving us proof of other acceptable insurance. If you obtain insurance of your own choosing at any time, please provide us with a copy. Once we receive and review your policy, we will cancel the insurance that we purchased and credit any unearned premium to your escrow account."

82. The letter dated July 19, 2021 from Defendant was accompanied by a document entitled "Lender-Placed Insurance Evidence of Hazard Insurance" which bore an effective date of May 23, 2021 to May 23, 2022 with an annual premium of $4,450.44.

83. There was no valid reason for Defendant to backdate the policy placed on July 19, 2021 to May 23, 2021. Backdating the policy increased the premium on the force-placed policy charged, to Plaintiff's detriment and Defendant's further unjust enrichment.

84. The forced placement of any insurance by Defendant in July 2021 was improper as sufficient funds were collected at the time of closing and placed in Plaintiff's escrow account controlled by Defendant to fund the insurance policy, per the lender's instructions and direction.

85. Paragraph three of Plaintiff's standard form mortgage/deed of trust addresses: "Funds for Escrow Items" and provides in pertinent part: "Borrower shall pay to lender on the day the Periodic Payments are due under the Note, until the Note is paid in full, as sum (the "Funds") to pay for payments or amounts due for: (a) taxes and assessments…(b) leasehold payments….(c) premiums for any and all insurance required by Lender under Section 5 and (d) Mortgage insurance premiums… …." *See* Exhibit A. Plaintiff fully complied with these obligations at all times by paying all required funds for principal, interest and the escrow account. The February 22, 2021

closing statement shows that Plaintiff paid the Lender at least 12 months of premiums for any insurance required, negating any need for the forced-placement of a different policy by Defendant in July 2021.

86. Upon review of the July 19, 2021 correspondence in April 2022 Plaintiff timely informed Defendant that he had paid for the insurance through his closing and escrow deposits and any force-placed policy (and additional premiums charged) was unnecessary and improper. Additionally, Defendant possessed Plaintiff's documents, including his closing statement, showing that he adequately funded the insurance premium at the February 2021 closing.

87. Defendant cannot charge a borrower like Plaintiff for force-placed insurance *unless* it has good reason to believe that the borrower is not complying with the requirement in their mortgage agreement to keep their property fully insured. Defendant did not have good reason to believe that Plaintiff was not complying with the requirement in his mortgage agreement to keep his property fully insured.

88. The charge imposed and paid by Plaintiff included amounts that were not true costs of insurance as permitted by the contract, specifically the amount of any rebate, kickback, commission or other thing of value provided, directly or indirectly, to Newrez.

89. There was no valid basis or authorization for the force-placement of this policy as Plaintiff did not fail to play the required amounts for insurance and funded the policy at the time of the loan closing months earlier. Based on this, the policy was not placed, charged, or paid by Plaintiff in any voluntary manner. Plaintiff never voluntarily paid any premium for any force-placed policy.

90. Plaintiff paid for the premiums through his escrow account, which was drained as a result of the force-placed policy premiums.

25

91.     Plaintiff has timely protested, demanded a refund of the premiums that were improperly charged and collected, and provided proof that his homeowner's policy was current, but as of time of filing no refund has been processed or received by Plaintiff.

92.     Upon information and belief, Defendant Newrez received a substantial kickback or commission from Insurer National Fire as a percentage of the premium for the force-placed policy.

93.     Based on the foregoing, Plaintiff was forced to retain counsel and file this class action lawsuit seeking monetary, declaratory, and injunctive relief for the defined Class. As Plaintiff still owns his home in Texas, Plaintiff remains subject to Defendant's unlawful practices, described and challenged herein, in the future. Further, Defendant's unlawful conduct is capable of repetition evading review if this matter does not go forward.

94.     As of this filing, Plaintiff has not received any "refund" or payment from any Defendant by check, cash, electronic transfer, bank wire, or any other means.

## V.     CLASS ACTION ALLEGATIONS

95.     Plaintiff's claims satisfy the requirements for class certification pursuant to Mich. Ct. R. 3.501 and any other applicable rule of civil procedure, and class certification is appropriately granted.[3] This action seeks recovery of actual damages, restitution, injunctive and equitable relief arising from Defendant's unfair business practices.

96.     The Class is defined as:

All borrowers subject to standard form mortgage contract, containing the same language in Paragraph 5 as Exhibit A,  serviced by NewRez, LLC on property located in United States who were charged and/or paid premiums for a force-placed insurance policy during the Class Period unless (1) the lender has obtained a foreclosure judgment against the borrower; (2) the borrower has entered into a short-sale agreement with the lender; (3) the borrower has granted a deed in lieu of foreclosure to the lender; (4) the borrower has entered into a loan modification

---

[3]     Plaintiff reserves the right to amend this complaint in the future to include additional class allegations, if discovery and further investigation reveals such action is warranted.

agreement with the lender; (5) the borrower has filed a claim for damages which has been paid in full or part by the force-placed insurer; or (6) the cost of the force-placed insurance was cancelled out in full (the "Class").

97.     The Class Period dates back to the start of the longest applicable statute of limitations for any claim asserted from the date this action was commenced and continues through the present and the date of judgment. ("Class Period")  Excluded from the Class or any subclass are: (a) any officers, directors or employees of Defendant; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) the undersigned counsel and all employees of their law firms; (d) any employee of the Court; and, (e) any juror selected to hear this case.

98.     Plaintiff reserves the right to modify or amend the above-referenced definitions before the Court determines whether certification is appropriate.

99.     **Numerosity:** Members of the class are so numerous that their individual joinder herein is impracticable. The Defendant sells and services thousands of mortgage loans and insurance policies in Michigan and other states. The individual class members are ascertainable as the names and addresses of all class members can be identified in the business records maintained by Defendant. The precise number of members of the class certainly numbers in the thousands, but the numbers are clearly more than can be consolidated into one complaint and impractical for each to bring suit individually. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

100.    **Ascertainability:** The proposed Class is ascertainable. The litigation of the questions of fact and law involved in this action will resolve the rights of all members of the Class and hence will have binding effect on all class members. These Class members can be readily identified from business records, billing systems, and telephone records of Defendant and other means readily available to the Defendant, and thus by the Plaintiff, through minimally intrusive

discovery. The Class is numerous. Joinder of all Class members is impracticable due to the relatively small monetary recovery for each Class member in comparison to the costs associated with separate litigation, and the likelihood that due to the nature of the force-placed insurance that Class members faced they may have when initially contacted by Defendant, Class members are likely in poor financial situations.

101. **Commonality:** There are questions of law and fact that are common to the Plaintiff's and Class members' claims. Defendant's defenses to the claims are also common and based on similar facts. These common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members of the Class. Among such common questions of law and fact are the following:

    a.   Whether Newrez breached its mortgage agreements with Plaintiff and the Class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and reinsurance payments) and by charging Plaintiff and the Class for servicing the loans;

    b.   Whether Defendant owes its customers a duty of good faith and fair dealing;

    c.   Defendant breached its duty of good faith and fair dealing by self-dealing and using its discretion to force place insurance to select an insurer providing it benefits;

    d.   Whether Defendant breached its duty of good faith and fair dealing by arranging for kickbacks or commissions for itself and/or its affiliates in connection with force-placed insurance and failing to disclose the same to customers;

    e.   Whether Defendant manipulated the force-placed insurance purchases in order to maximize the profits to itself to the great detriment of Plaintiff and the Class;

f.  Whether Defendant or affiliates provide any work or services in order to receive a commission or other compensation;

g.  Whether Defendant was unjustly enriched by its conduct;

h.  Whether Defendant's form letters are false, deceptive, and/or misleading;

i.  The appropriateness and proper form of any declaratory or injunctive relief; and

j.  The appropriateness and proper measure of monetary and other damages sustained by the Class;

k.  The applicability of Defendant's defenses.

102.  **Typicality:** Plaintiff is a member of the Class and his claims are typical of the claims of members of the Class. Typical of other Class members, Plaintiff was charged and paid an inflated non-competitive premium for a force-placed insurance policy during the Class Period. Plaintiff has a standard form mortgage / deed of trust uniform instrument. Plaintiff and the Class members each sustained, and will continue to sustain, damages arising from Defendant's common and uniform course of wrongful conduct, as alleged more fully herein. Plaintiff's claims are founded on the same legal theories as those of the Class.

103.  **Adequacy of Representation:** Plaintiff will fairly and adequately represent and protect the interest of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in the prosecution of complex class action involving consumer fraud, including mortgage fraud. Plaintiff has no interests contrary to the Class members, and will fairly and adequately protect the interests of the Class.

104.  To prosecute this case, Plaintiff has retained the law firm of Zimmerman Reed LLP. This firm has extensive experience in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

105.     The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiff and the unnamed Class members are based on the force-placed insurance policies that Defendant unlawfully secured through a common and uniform course of misconduct.

106.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

107.     **Superiority of Class Adjudication:** The certification of a class in this action is superior to the litigation of a multitude of cases by members of the putative Class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are Class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendant and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the Class members in relationship to the benefits received. The damages, restitution and other potential recovery for each individual member of the Class are modest, relative to the substantial burden and expense of individual prosecution of these claims. Given the amount of the individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein. Individualized litigation increases the delay and expense to all parties and the court system, particularly given the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

108.     In the alternative, the above-referenced Class may be certified because:

a.  The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendant;

b.  The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the adjudications, or which would substantially impair or impede the ability of other Class members to protect their interests; and

c.  Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## VI.  **CAUSES OF ACTION**

### FIRST CAUSE OF ACTION
**Breach of Contract**

109.  Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

110.  Plaintiff and the Class have standard form mortgage contracts with Newrez that are similar in all material aspects with respect to force-placed insurance. (A true and correct copy of Plaintiff's mortgage contract is attached as Exhibit A). The contracts are adhesion contracts which are not able to be negotiated by borrowers with respect to standard clauses like those in paragraph five addressing force-placed insurance. At all times, Newrez was contractually obligated to service the loans of Plaintiff and the Class pursuant to the terms of the mortgage contracts.

111.  The underlying mortgage agreements between Defendant and Plaintiff and the Class are valid and enforceable.

112.    Plaintiff and the Class members performed their duties under the contract by tendering all monthly payments to Defendant and its predecessors and by complying with all of the other terms of the contract.

113.    To the extent the mortgage contracts of Plaintiff and the Class members permitted Newrez to unilaterally force-place insurance, Newrez was contractually permitted to do so only to the extent necessary to protect the mortgagee's interest in the secured property.

114.    Plaintiff never failed to pay the required amount to Newrez to fund his insurance policy. At the February 2021 closing, Plaintiff paid the following towards his escrow account: "Homeowner's insurance $81.75 per month for 12 mo. $981.00" and thereafter continued to pay the required amount towards his monthly escrow payment for insurance each month after that providing sufficient funds for the policy. The conditions for Defendant to force place insurance in July 2021 under Paragraph five of the mortgage were not satisfied.

115.    Under these mortgage contracts, Defendant was permitted to obtain force-placed insurance in the event of an actual lapse in coverage. However, Newrez was only permitted to do so in a manner and amount that is reasonable and appropriate to protect an insurable interest in the property. Although these mortgage contracts allow Newrez to charge the homeowners for true "cost of the insurance coverage so obtained" and "amounts disbursed," nothing in the contract authorizes Newrez to charge Plaintiff and the Class for amounts retained, rebated, or kicked-back to Newrez, or for illusory placement services. Defendant intentionally elected to purchase insurance from a company that built in an illusory "cost of insurance" to fund a rebate to Defendant. Amounts rebated or kicked-back to Newrez, in transactions such as Plaintiff's, are not a "cost of the insurance coverage" and are not a true "disbursement" authorized under Paragraph five or any other provision of the form mortgage contract.

116.    All charges related to force-placed insurance must be bona fide and reasonable, and the amount charged must bear a reasonable relationship to the servicer's cost of providing the service. 12 C.F.R. §1024.37(h). Here they did not.

117.    Newrez breached their mortgage contracts with Plaintiff and the Class in at least the following respects:

      a.  Charging Plaintiff and the Class for "costs of insurance" that exceeded the true costs of insurance and amounts truly "disbursed" to the insurer:

      b.  Exceeding their contractual authority to require borrowers to pay for the cost or expenses the lender incurred for force-placed insurance by requiring borrowers, such as Plaintiff and the Class, to pay the full gross amount of the premium for force-placed insurance, irrespective of the fact that the full gross premium amount was not actually an expense or cost to Newrez because a portion of it was paid back to Newrez and/or their affiliates in the form of a pre-negotiated commission;

      c.  Collecting a percentage, or allowing its affiliates to collect a percentage, of whatever premiums are charged to Plaintiff and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek and force-place upon the borrower the highest-priced premiums possible;

      d.  Charging Plaintiff and the Class for compensation for placing the force-placed insurance where such compensation was not authorized by the contract and no actual services were performed by Newrez to earn such compensation;

118.    As direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiff and the Class members have suffered damage, financial loss, and injury.

119.    The conduct set forth above has and continues to harm Plaintiff and the Class. Unless enjoined, these practices will continue to put Class members at risk of further damage and loss. A declaration of the parties' rights under the contracts is appropriate and sought.

120.    By reason of the foregoing, Plaintiff and each member of the Class are entitled to recover from Defendant damages, restitution, injunctive relief, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of
### Good Faith and Fair Dealing

121.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

122.    The implied covenant of good faith and fair dealing is implied in and made part of all contracts, including any contracts between Plaintiff and Class members and Newrez. Good faith and fair dealing is an element of every contract and imposes upon each party a duty of good faith and fair dealing in its performance. This is a common legal doctrine in each state in which Class members reside and Newrez services loans.

123.    The implied covenant of good faith and fair dealing requires a party vested with discretion under a contract to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

124.    When an agreement permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such determination is implied.

125.    Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith.

126.    In general, the implied covenant of good faith and fair dealing seeks to protect the contracting parties' reasonable expectations and serves to supply limits on the parties' conduct when their contract defers decision on a particular term, omits terms, or provides ambiguous terms.

127.    Discretion in performance arises in several ways. For instance, as here, the parties may find it to their mutual advantage at time of formation to defer decision on a particular term and to confer decision-making authority as to that term on one of the parties. In such situations, the dependent party must rely on the good faith of the party in control. In such situations, courts raise explicitly the implied covenant of good faith and fair dealing, and interpret a contract in light of good faith performance.

128.    Plaintiff and the Class members' mortgage contracts are subject to the implied covenant of good faith and fair dealing.

129.    Plaintiff and the Class members' mortgage contracts contained a provision that allowed the mortgage servicer to force-place an insurance policy on the borrower if their homeowner's insurance actually lapsed. Newrez was party to a contract with Plaintiff and each Class member that made the manner of its performance a matter of its own discretion. Plaintiff and other members of the Class, in turn, were dependent on Newrez and relied on Newrez as the party in control to act reasonably, in good faith, and with proper motive.

130.    In exercising that discretion in Plaintiff's and the Class members' transactions and selecting an insurance provider and insurance product to apply to Plaintiff's account, Newrez acted unreasonably, in bad faith, and with bad motive and intentions. Newrez's conduct went beyond

mere negligence, unreasonableness, or the making of poor choices, and instead amounted to acting intentionally with bad motive and bad intention in order to self-deal, maximize profits pursuant to Newrez's secret side deal for kickbacks with Insurers, and to penalize Plaintiff and the Class who bore the entire financial burden and cost of the transaction.

131. In exercising its discretion, Newrez acted with bad motive and intention in order to self-deal and penalize Plaintiff and the other Class members by purchasing insurance with less coverage and vastly higher premiums than alternative policies available in the marketplace and able to be purchased with no additional burden. Rather than acting out of concern for its security, Newrez seized upon the perceived lapse in coverage as a money-making opportunity for it and entities it had private kickback deals with (Insurers, such as National Fire), and as an opportunity to penalize Plaintiff and the Class financially. Newrez acted not to protect its security in good faith, but rather to increase its profits at the expense of Plaintiff and other vulnerable persons in the Class by funneling business to entities (Insurers, such as National Fire), that it had conspired with and agreed to pay it the largest kickbacks even though Newrez conducted no work and performed no services to earn any such "commissions" or kickbacks received. These were not costs properly charged to Plaintiff and the Class.

132. But for the desire to maximize their kickback revenue and the desire to penalize Plaintiff and the Class, no rational person would have chosen to purchase the type of insurance policies Newrez did for Plaintiff and the Class.

133. Mortgage servicers or lenders, like Defendant, are permitted to unilaterally choose the company to purchase force-placed insurance from but have an obligation to exercise their discretion in good faith and not choose the company capriciously and in bad faith (solely for their

or their affiliates own financial gain) instead of seeking to continue or reestablish the prior insurance policies or seeking competitive bids on the open market in good faith.

134. In all of their actions described herein, Newrez acted on its own behalf and as the duly authorized agent of the owner or assignee of the mortgage agreement of Plaintiff and the members of the Class. Newrez was contractually obligated to service the loans of Plaintiff and the members of the Class pursuant to the terms of the mortgage agreements.

135. The mortgage contracts and insurance policies of Plaintiff and the Class contained an implied covenant of good faith and fair dealing whereby Defendant agreed to perform the obligations under the policies in good faith, to deal fairly with Plaintiff and the Class, and not to charge unnecessarily inflated fees for the force-placed insurance for the purpose of maximizing their own profits at the Class's expense. Any discretionary authority granted to Newrez under the terms of the Plaintiff's and members of the Class's mortgage contracts was subject to Newrez implied duty of good faith and fair dealing. Accordingly, to the extent that the mortgage contracts of Plaintiff and the members of the Class permitted Newrez to unilaterally force-place insurance, Newrez was obligated not to exercise their discretion to do so in bad faith for their own financial gain for the purpose of maximizing profits at borrowers' expense.

136. Newrez breached their duty of good faith and fair dealing in at least the following respects:

      a. Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead, and for the sole purpose of maximizing their own profits, forcing borrowers to pay for insurance policies from providers of Newrez's choice, such as Insurers like National Fire. Their policies needlessly came with

substantially greater premiums and less coverage than borrowers' existing policies which provided an improper financial benefit to Newrez and/or its affiliates;

b. Using their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance policies to maximize their own profits;

c. Failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby the insurance policies are continually purchased through the same companies without seeking a competitive price;

d. Assessing excessive, inflated and unnecessary insurance policy premiums against Plaintiff and the Class misrepresenting the reason for the cost of the policies;

e. Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to Plaintiff and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

f. Charging Plaintiff and the Class for commissions and claiming it to be a "cost" when the insurance is prearranged and no commission is due;

g. Charging Plaintiff and the Class for having the vendor perform their obligation of administering its mortgage portfolio, which is not chargeable to Plaintiff or the Class.

137. As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages, financial loss, and injury.

138. The unlawful and unfair business practices set forth above have and continue to harm Plaintiff and the Class. Unless enjoined these practices will continue, and continue to put Class members at risk of further damage and loss. As a result, Plaintiff and the Class are entitled to injunctive, declaratory, and other equitable relief.

139. By reason of the foregoing, Plaintiff and each member of the Class are entitled to recover from Defendant damages, restitution, injunctive relief, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

## THIRD CAUSE OF ACTION

### Breach of the Michigan Consumer Protection Act
### (Mich. Comp. Laws Ann. §§ 445.901 *et seq.*)

140. Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

141. The Michigan Consumer Protection Act (Mich. Comp. Laws Ann. §§ 445.901 *et seq.*, the "MCPA") prohibits "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce. Mich. Comp. Laws Ann. § 445.903.

142. "Trade or commerce" is defined as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article or a business opportunity. Mich. Comp. Laws Ann. § 445.902(g).

143. Newrez is engaged in "trade or commerce" under the definition of the MCPA as it provides goods, property, or service primarily for personal, family, or household purposes, and offers for sale, rent, or distribution a service or property.

144.     Newrez informs borrowers that it maintains offices in Troy, Michigan where it services loans from and for borrowers to contact and conduct business with it in Troy, Michigan. The MCPA therefore applies to its conduct here for borrowers residing in Michigan as well as other states, such as Plaintiff. Newrez's deceptive and unfair conduct, described herein, was conducted in Michigan and those practices emanated to its transactions with borrowers in other states.

145.     The MCPA permits actions for damages, declaratory judgment, or injunctions or other appropriate relief. Mich. Comp. Laws Ann. § 445.911(5).

146.     One of the enumerated prohibitions of the MCPA is "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . ." Mich. Comp. Laws Ann. § 445.903(c). Defendant violated this provision by representing to Plaintiff and the Class members that the cost passed on to the borrower would be the "cost of insurance" when in fact the cost passed on included a secret kickback to Defendant which greatly inflated the overall cost of the policy.

147.     Another of the enumerated prohibitions of the MCPA is "[c]ausing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction." Mich. Comp. Laws Ann. § 445.903(n). Defendant violated this provision by representing to Plaintiff and the Class members that the cost passed on to borrowers would be the "cost of insurance" when in fact the cost passed on included a secret kickback to Defendant which greatly inflated the overall cost of the policy.

148.     Another of the enumerated prohibitions of the MCPA is "[c]ausing a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction." Mich. Comp. Laws Ann. § 445.903(o). By purchasing force-place insurance and

billing borrowers by rolling the cost of the policy into the mortgage payments or escrow payments, Defendant made the premium part of the cost of credit for the mortgage. Defendant violated this provision by representing to Plaintiff and the Class members that the cost passed on to borrowers would be the "cost of insurance" when in fact the cost passed on included a secret kickback to Defendant which greatly inflated the overall cost of the policy.

149.    Another of the enumerated prohibitions of the MCPA is "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. Laws Ann. § 445.903(s). Defendant violated this provision by failing to disclose to borrowers that a) the insurance product purchased was not purchased as the result of competitive processes in which Defendant "shopped around" for the best rate, b) the premium included a secret kickback to Defendant which amounted to a significant portion of the premium, c) the force-placed insurance policies are the product of Defendant negotiating with insurance providers to obtain the highest possible fee for Defendant. These facts could not be reasonably known to the consumer as, on information and belief, the contracts between Defendant and Insurers such as National Fire are confidential and not publicly available.

150.    Another of the enumerated prohibitions of the MCPA is "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold." Mich. Comp. Laws § 445.903(z). As demonstrated by Plaintiff's pre-existing policy with Progressive which cost only $981.00 per year despite providing superior coverage, insurance is available on the open market for a tiny fraction of the cost charged by Defendant for policies that are force-placed. The forced placed policy that Defendant purchased in July 2021 was over four times the price ($4450.44) of the prior policy. Defendant routinely force-places policies to Class members

that cost many multiples of the prevailing market rate for homeowner's insurance. In doing so, Defendant charges the consumer a price that is grossly in excess of the price at which similar property or services are sold. Plaintiff does not challenge National Fire or any other Insurer's rates; instead, Plaintiff challenges Defendant's conduct and exercise of discretion in selecting the insurance company from which to buy higher-priced, force-placed policies from without disclosure to Plaintiff of all material facts (e.g., the specific rebate and thing of value provided).

151.   As direct, proximate, and legal result of the aforementioned violations, Plaintiff and the Class have suffered damages, financial loss, and injury.

152.   The unlawful, unconscionable, and deceptive practices set forth above have harmed and continue to harm Plaintiff and the Class. Unless enjoined, these practices will continue, and continue to put Class members at risk of further damage and loss. As a result, Plaintiff and the Class are entitled to injunctive, declaratory, and other equitable relief.

153.   By reason of the foregoing, Plaintiff and each member of the Class are entitled to recover from Defendant damages, restitution, injunctive relief, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

## FOURTH CAUSE OF ACTION

### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. §§ 201-1-201-9.2)

154.   Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

155.   This claim is asserted in the alternative to the Third Cause of Action.

156.   Defendant maintains offices in Pennsylvania.

42

157.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. §§ 201-1-201-9.2) prohibits "unfair methods of competition" and "unfair or deceptive acts or practices."

158.    "Trade" and "Commerce" are defined as "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." Defendant's conduct as alleged clearly constitutes "Trade" and "Commerce" for the purpose of the Law.

159.    Under § 201-2, "Unfair methods of competition" and "unfair or deceptive acts or practices" are defined to mean one of any of a list of practices. § 201-2(4). These include:

    a.   "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." Defendant violated this law by intentionally misleading borrowers as to the "source" of the force-placed policies, and particularly by disguising their conduct in negotiating for these policies, including their receipt of hefty kickbacks.

    b.   "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have." Defendant violated this law by failing to disclose its practice of negotiating for secret kickbacks on force-placed insurance policies.

    c.   "Knowingly misrepresenting that services, replacements, or repairs are needed if they are not needed." Defendant violated this law by representing the force-placed

policies acquired as necessary, when they are in fact grossly inflated by the payment of undisclosed kickbacks to Defendant.

160.    As direct, proximate, and legal result of the aforementioned violations, Plaintiff and the Class have suffered damages, financial loss, and injury.

161.    The unlawful, unconscionable, and deceptive practices set forth above have harmed and continue to harm Plaintiff and the Class. Unless enjoined, these practices will continue, and continue to put Class members at risk of further damage and loss. As a result, Plaintiff and the Class are entitled to injunctive, declaratory, and other equitable relief.

162.    By reason of the foregoing, Plaintiff and each member of the Class are entitled to recover from Defendant damages, restitution, injunctive relief, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

## FIFTH CAUSE OF ACTION

### In the Alternative: Money Had and Received / Unjust Enrichment (Restitution)

163.    Plaintiff alleges and incorporates by reference the preceding paragraphs above as if fully set forth herein, except those inconsistent with this count.

164.    Newrez received from Plaintiff and the Class members a benefit in the form of overcharges related to force-placed insurance policies, specifically in the form of undisclosed and unwarranted kickbacks and commissions. Had Defendant used its discretion to select alternative insurers to place the insurance, it would have been cheaper for borrowers like Plaintiff. Defendant's self-dealing in selecting an insurer resulted in additional revenues flowing to it which were unjust.

165.    Defendant entered into an agreement whereby the vendors—Insurers—would provide force-placed insurance policies to Newrez through its preferred insurance carriers for the portfolio of loans it monitored which were paid for by Plaintiff and the Class at prices that were higher priced than the alternative policies.

166.    Insurers paid and transmitted significant monies in kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage). These commissions or kickbacks were paid to Newrez and/or its affiliates in order to be able exclusively provide force-placed insurance policies.

167.    The kickbacks and commissions were subsumed into the price of the insurance premium and ultimately paid by the borrower. Therefore, Defendant had the incentive to charge and collect the high prices for the force-placed policies and to bypass lower price options that were available.

168.    As a result, Plaintiff and the Class have conferred a benefit on Defendant, and Defendant had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them, namely the kickbacks and commissions.

169.    Newrez will be unjustly enriched if it is allowed to retain the benefit, and each Class member is entitled to an amount equal to the amount each Class member enriched Newrez and for which Newrez has been unjustly enriched.

170.    Nothing herein seeks to stop National Fire or other insurers from selling force-placed policies, or end the Defendant's practice of force-placing insurance on properties. Likewise, Plaintiff does not challenge the insurance rates. Plaintiff only seeks that the Defendant provide the same in good faith in its discretionary act of selecting the insurance and to avoid self-dealing and maximizing its revenues at the expense of Plaintiff and the class, who are in vulnerable positions.

171.    The unlawful and unfair business practices set forth above have harmed and continue to harm Plaintiff and the Class. Unless enjoined, these practices will continue, and continue to put Class members at risk of further damage and loss. Plaintiff and the Class are entitled to equitable and declaratory relief.

By reason of the foregoing, Plaintiff and each member of the Class are entitled to recover from Defendant restitution, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of those similarly situated, requests relief as follows on all counts:

A.    For an order certifying the Class pursuant to Mich. Ct. R. 3.501 (or any other applicable rule of civil procedure) and appointing Plaintiff and his undersigned counsel to represent the Class;

B.    For preliminary and permanent injunctive relief prohibiting Defendant from engaging in the wrongful practices alleged in this Complaint;

C.    For damages sustained by Plaintiff and the Class (as to Counts 1, 2, 3 and 4 only);

D.    For restitution in an amount to be determined at trial;

E.    For declaratory relief;

F.    For disgorgement of profits;

G.    For payment of reasonable attorneys' fees and costs pursuant to the "common fund" doctrine, any applicable statutory fee-shifting provisions, equitable principles of contribution, and/or any other applicable method of awarding attorneys' fees and costs in class actions;

H.    For payment of costs of suit incurred herein;

I.      For payment of prejudgment interest as provided by law; and

J.      For any such further relief as this Court deems equitable, just and proper.

## VII.   **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial of her claims to the extent authorized by law.

Respectfully submitted,

ZIMMERMAN REED LLP

Dated: August 29, 2022      By:    /s/ Caleb Marker
Caleb Marker
Flinn T. Milligan
6420 Wilshire Blvd, Suite 1080
Los Angeles, CA 90048
(877) 500-8780 Telephone
(877) 500-8781 Facsimile
caleb.marker@zimmreed.com
flinn.milligan@zimmreed.com

ZIMMERMAN REED LLP

Hart L. Robinovitch
14646 N Kierland Blvd., Suite 145
Scottsdale, AZ 85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile
hart.robinovitch@zimmreed.com

*Attorneys for Plaintiff*

# EXHIBIT A

**When recorded, mail to:**
**Nationwide Title Clearing, Inc.**
**2100 ALT 19 North**
**Palm Harbor, FL 34683**

**This document was prepared by:**
**INTERCONTINENTAL CAPITAL GROUP, INC.**
**265 BROADHOLLOW ROAD**
**SUITE 220**
**MELVILLE, NY 11747**

**Title Order No.: 1801109**
**Escrow No.: 2021-00093**
**LOAN #: 2101347154**

———————————————————————————[Space Above This Line For Recording Data]———————————————————————————

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

| FHA Case No. |
| --- |
| **512-4162808-703** |

# DEED OF TRUST

**MIN: 1004810-0000341312-3**
**MERS PHONE #: 1-888-679-6377**

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 15.
**(A) "Security Instrument"** means this document, which is dated **February 22, 2021,**          together with all Riders to this document.
**(B) "Borrower"** is   **BRYAN APODACA.**

Borrower is the grantor under this Security Instrument.
**(C) "Lender"** is   **INTERCONTINENTAL CAPITAL GROUP, INC..**

Lender is   **a NEW YORK CORPORATION,**                              organized and existing
under the laws of   **New York.**
Lender's address is   **265 BROADHOLLOW ROAD , SUITE 220, MELVILLE, NY 11747**

Lender includes any holder of the Note who is entitled to receive payments under the Note.
**(D) "Trustee"** is   **Michael Burns, Attorney At Law.**

**TEXAS** – Single Family – Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**     **Form 3044**     **1/01 (rev. 10/17)**
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                       Page 1 of 10                              TXEFHA15DE   0118
                                                                                                                      TXEDEED (CLS)



LOAN #: 2101347154

Trustee's address is **P.O. Box 992, Allen, TX 75013.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **February 22, 2021.** The Note states that Borrower owes Lender **THREE HUNDRED TWENTY TWO THOUSAND NINE HUNDRED ELEVEN AND NO/100* * \*** * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * Dollars (U.S. **$322,911.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 1, 2051.**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider   ☐ Condominium Rider   ☒ Planned Unit Development Rider
☐ Other(s) [specify]

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his designee.

**(S) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County**

[Type of Recording Jurisdiction]

of **Harris**

[Name of Recording Jurisdiction]:

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 138-719-001-0035**



LOAN #: 2101347154

which currently has the address of   18511 Panton Terrace Ln, Cypress,

[Street] [City]

Texas  77429               ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

**TEXAS** -- Single Family -- **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   **Form 3044**   **1/01 (rev. 10/17)**
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                          Page 3 of 10                          TXEFHA15DE   0118
                                                                              TXEDEED (CLS)



LOAN #: 2101347154

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 24 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**TEXAS** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **Form 3044** **1/01 (rev. 10/17)**
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.

TXEFHA15DE 0118
TXEDEED (CLS)



LOAN #: 2101347154

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing



LOAN #: 2101347154

Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Note holder agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all



sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceedings; (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**22. Grounds for Acceleration of Debt.**

**(a) Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

    (i)  Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

    (ii)  Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

**(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

    (i)  All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

    (ii)  The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

**(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

**(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.



LOAN #: 2101347154

**(e) Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**23. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Section 23.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**24. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 24, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 24, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.**

If Lender invokes the power of sale, Lender, its designee, or Trustee shall give notice of the date, time, place and terms of sale by posting and filing the notice as provided by Applicable Law. Lender or its designee shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be public, occurring between the hours of 10 a.m. and 4 p.m. on a date and at a location permitted by Applicable Law. The time of sale must begin at the time stated in the notice of sale or not later than three hours after the stated time. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 24, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Section 22, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Section 24 or applicable law.

**25. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**26. Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

**27. Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due



LOAN #: 2101347154

and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

**28. Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

**29. Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property. Check box as applicable:**

☐ **Purchase Money.**

The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

☐ **Owelty of Partition.**

The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

☒ **Renewal and Extension of Liens Against Homestead Property.**

The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

☐ **Acknowledgment of Cash Advanced Against Non-Homestead Property.**

The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ **(Seal)**
**BRYAN APODACA**                                                                                                              **DATE**

**State of TEXAS**                                                                                                **County of HARRIS**

Before me, _____, on this day personally appeared BRYAN APODACA, known to me (or proved to me on the oath of _____ or through _____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.

_____
**(Notary Public Signature)**

**TEXAS** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3044    1/01 (rev. 10/17)**
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                                                  Page 9 of 10                                                  TXEFHA15DE   0118
                                                                                                                                                                 TXEDEED (CLS)



LOAN #: 2101347154

**Lender: INTERCONTINENTAL CAPITAL GROUP, INC.**
**NMLS ID: 60134**
**Loan Originator: Shelly Johnson**
**NMLS ID: 1920195**

**TEXAS** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**     **Form 3044**     **1/01 (rev. 10/17)**
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                                     Page 10 of 10                                                     TXEFHA15DE   0118
                                                                                                                                      TXEDEED (CLS)



# EXHIBIT 2

Approved, SCAO

|  | Original - Court | 2nd copy - Plaintiff |
|  | 1st copy - Defendant | 3rd copy - Return |

| **STATE OF MICHIGAN** | | **CASE NO.** |
| **JUDICIAL DISTRICT** | **SUMMONS** | 2022-195857-CZ |
| 6th **JUDICIAL CIRCUIT** | | |
| **COUNTY PROBATE** | | |

| Court address | Court telephone no. |
| 1200 N Telegraph Rd, Dept 404, Pontiac, MI 48341 | 248-858-0344 |

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
| BRYAN APODACA, an individual, on behalf of the general public, c/o counsel. | v | NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING d/b/a NEWREZ MORTGAGE c/o registered agent CSC-LAWYERS INCORPORATING SERVICE (COMPANY) 2900 WEST ROAD STE 500 EAST LANSING, MI 48823 Tel: 888-673-5521 |

| Plaintiff's attorney, bar no., address, and telephone no. | |
| Caleb Marker (MI. Bar # P70963) ZIMMERMAN REED LLP 6420 Wilshire Blvd., Suite 1080 Los Angeles, CA 90048 Tel: 877-500-8780 | This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling. |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☑ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer   pending.

Summons section completed by court clerk.      | **SUMMONS** |

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date 9/1/2022 | Expiration date* 12/1/2022 | Court clerk Lisa Brown |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (9/19)   **SUMMONS**                MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

**SUMMONS**

Case No. 2022-195857-CZ

**PROOF OF SERVICE**

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

| CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE |
|---|

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:  (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that:  (notarization required) |

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | | Title |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
Date

My commission expires: _____   Signature: _____
Date                                                        Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

| ACKNOWLEDGMENT OF SERVICE |
|---|

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____
Signature